# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEITH S. BROWN, | : | Civil No. 1:20-CV-0849 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DR. MARY JOY MONSALUD, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

The motions to dismiss filed by Defendants Dr. Mary-Joy Monsalud, Dr. Andrew Newton, and Corrections Health Care Administrator ("CHCA") Karen Holly are presently before the court for disposition.[1]  (Docs. 7, 18, 24.)  For the reasons set forth below, Brown's claims under the Americans with Disabilities Act ("ADA") against Dr. Monsalud and Dr. Newton will be dismissed with prejudice. Plaintiff's ADA claims against CHCA Holly in her individual capacity will also be dismissed with prejudice.  The Defendants' motions to dismiss Brown's Eighth Amendment medical and state law intentional infliction of emotional distress claims will be denied.  Defendants will be directed to file an answer to the complaint in accordance with the Federal Rules of Civil Procedure.

---

[1] All Defendants are represented by separate counsel.

FACTUAL BACKGROUND

Keith Brown ("Plaintiff" or "Brown"), a self-represented individual housed at the Frackville State Correctional Institution ("SCI-Frackville") in Frackville, Pennsylvania, initiated this action on May 1, 2020 in the Court of Common Pleas of Schuylkill County. Defendant Monsalud removed the action to this court on May 26, 2020. (Doc. 1.)

In his complaint, Brown describes himself as an individual with a significant history of mental illness with hospitalizations, and limited vision due to glaucoma and a corneal transplant. (Doc. 1-3, ¶ 5.) Based on these ailments, Brown claims to be a qualified individual with a disability under the terms of the ADA, 42 U.S.C. § 12131(2). He adds that he has a "very long history of suicide attempts with all his medication." (*Id.*, ¶¶ 6, 11, 34.)

Upon Brown's arrival at SCI-Frackville in April 2018, he advised all Defendants of his "special needs" and that he was "not allowed to hold any medication inside his cell" per a Bureau of Health Care Services directive. He cites to a March 23, 2016 Final Appeal Decision resolving Grievance 592113 ("Final Grievance Appeal") as evidence of this mandate. (*Id.*, ¶ 10; *see also* Doc. 1-2, p. 10.)[2] In the appeal, the DOC's Bureau of Health Care Services reviewed Brown's 2015 concerns that he was not capable "of self-administering [his]

---

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

glaucoma eye [drops] based on [his] history and risk of self-harm" while housed at a different prison.  (*Id.*)  Brown was "encouraged to participate in [his] treatment plan to self-administer [his] eye drops under supervision of the medical staff in the medical department" and advised the Defendants that all medication, including his "7 bottle[s] of eye drops and his pills" must be taken "under the supervision of medical staff down in the medical department."  (Doc. 1-3, ¶ 11.)

"Defendants [were] complying" with the terms of the grievance response until June 7, 2019, when Brown filed a grievance against the nursing staff for allowing officers to handle his medications.  (Doc. 1-3, ¶ 12.)  On June 7, 2019, Defendants Monsalud, Newton, and Holly "were waiting" for Brown to report to the treatment line.  When he arrived, "Defendants had the Plaintiff['s] medication in a big plastic bag [and] t[old] the plaintiff if he do[es]n't take his medication back to his cell then he don't get nothing."  (*Id.*, ¶ 13.)  Brown warned them "he can't do that and that they disregard the excessive risk to [his] health and safety."  (*Id.*)  Defendants retorted that "they don[']t care if [he] killed himself."  (*Id.*)

After that encounter, Brown was denied his eye drops for a month until someone from Governor Wolf's Office intervened.  Brown lost the vision in his right eye due to the lack of the medication.  (*Id.*, ¶¶ 14, 17.)  He also "suffered severe physical damages, including but not limited to the risk created by unsafe and unhealthy living conditions and exposure to degrading and in human

conditions of confinement resulting in great emotional distress." (*Id.*, ¶ 31.)

Defendants' actions "caused the Plaintiff severe emotional distress, anxiety, and

fear." (*Id.*, ¶ 41.)

Brown asserts that Defendants violated Title II of the ADA and the Eighth

Amendment when they modified the manner of access to his prescription

ophthalmic drops which placed him at an increased risk of harm due to his known

vulnerability to self-harm with prescription medication under his exclusive control.

Defendants' denial of prescription ophthalmic medication for three weeks lead to

his loss of vision in his right eye.  Brown also sets forth a state law claim of

intentional infliction of emotional distress ("IIED") due to the extreme and

outrageous nature of Defendants' conduct.  (Doc. 1-3.)  Each Defendant has filed

a motion to dismiss Brown's ADA, Eighth Amendment, and IIED claim.  (Docs. 7,

18, and, 24.)  Brown filed a consolidated opposition brief.  (Doc. 60.)  Only

CHCA Holly filed a reply brief.  (Doc. 61.)  The motions are now ripe for

disposition.

## JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331,

which allows a district court to exercise subject matter jurisdiction in civil cases

arising under the Constitution, laws, or treaties of the United States.  The court has

supplemental jurisdiction over Plaintiff's related state law claim of intentional

infliction of emotional distress in accordance with 28 U.S.C. § 1367(a).

## STANDARD OF REVIEW

In order "[t]o survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the

plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (quoting

*Twombly*, 550 U.S. at 556). "Conclusory allegations of liability are insufficient" to

survive a motion to dismiss. *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir.

2019) (quoting *Iqbal*, 556 U.S. at 678–79). To determine whether a complaint

survives a motion to dismiss, a court identifies "the elements a plaintiff must plead

to state a claim for relief," disregards the allegations "that are no more than

conclusions and thus not entitled to the assumption of truth," and determines

whether the remaining factual allegations "plausibly give rise to an entitlement to

relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

Under Rule 12(b)(6), the court must accept all well pleaded allegations as

true and construe all reasonable inferences in favor of the nonmoving party. *Doe*

*v. Univ. of the Scis.,* 961 F.3d 203, 208 (3d Cir. 2020). The pleadings of self-

represented plaintiffs are held to a less stringent standard than formal pleadings drafted by attorneys and are to be liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d. Cir. 2011). Self-represented litigants are to be granted leave to file a curative amended complaint even when a plaintiff does not seek leave to amend, unless such an amendment would be inequitable or futile. *See Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 245 (3d Cir. 2008). However, a complaint that sets forth facts which affirmatively demonstrate that the plaintiff has no right to recover is properly dismissed without leave to amend. *Dooley*, 957 F.3d at 376 (citing *Grayson v. Mayview State Hospital*, 293 F.3d 103, 106 (3d Cir. 2002)).

**DISCUSSION**

**A.   Brown's ADA Claims against Defendants in their Individual and Official Capacities**

**1.  Title II of the ADA**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. As prisons fall within the definition of "public entity," prisoners may bring claims against their jailors for disability discrimination under Title II of the ADA. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209–210 (1998); *see also* 42 U.S.C. § 12313(1).

"[T]he phrase 'service, program, or activity' under Title II … is 'extremely broad in scope and includes anything a public entity does.'" *Furgess v. Pa. Dept. of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019).  As such, "a prison's refusal to accommodate inmates' disabilities in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constitutes a denial of the benefits of a prison's services, programs, or activities under Title II" of the ADA. *Furgess*, 933 F.3d at 290 (internal quotation and citation omitted).

To state a cognizable claim under Title II of the ADA, a plaintiff must show that:  "(1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Mutschler v. SCI Albion CHCA Health Care*, 445 F. App'x 617, 621 (3d Cir. 2011).

Broadly construing this self-represented litigant's pleading, Brown alleges that Defendants denied him access to medical care based on his mental health disability which resulted in physical and mental harm.  Specifically, he claims to suffer from a long and documented history of ophthalmic and mental health issues.  The latter makes unrestricted access to prescription medication an irresistible temptation to harm himself, a complication of his disability known by Defendants.  At the motion to dismiss stage, as the court is bound by the allegations of the complaint,

Brown has sufficiently alleged that he suffers from a qualifying disability.

Moreover, accepting as true that Defendants delivered Brown an ultimatum of

either taking his eye medication to his cell or forgoing them, these claims assert a

Title II denial of medical services claim under the ADA.  *See Anderson v. Bickell*,

754 F. App'x 113, 116 (3d Cir. 2018) (holding that "under some circumstances,

forcing an inmate to endure pain in order to access a program or service could

constitute the denial of access for ADA purposes).  The court finds Brown's

predicament in complying with the options presented by Defendants in order to

access necessary medical care to be adequate to make out this claim.  Whether or

not Brown can prove his allegations is yet to be seen, but at this point, he has

adequately asserted facts to establish a Title II ADA claim.

### 2.  Brown's Individual Capacity ADA Claims against Defendants

Defendants argue that Brown's Title II ADA claim against them in their

"individual capacities" fails as a matter of law.  *See* Docs. 17, 19, 25.  Although the

United States Court of Appeals for the Third Circuit has not addressed the issue

precedentially, it has indicated in several non-precedential decisions that Title II of

the ADA does not recognize claims for monetary damages against government

officers in their individual capacities.  *See Kokinda v. Pa. Dep't of Corr.*, 779 F.

App'x. 938, 942 (3d Cir.  2019) (per curiam) (holding that plaintiff's "claims for

individual damages liability under Title II of the ADA fail for the simple reason

that there is no such liability." (internal citations omitted)); *Bowens v. Wetzel*, 674 F. App'x 113, 136 (3d Cir. 2017) (noting that "the District Court could have properly followed the holdings of [other] circuits which have concluded that there is no individual damages liability under Title II of the ADA, which provides an additional basis to affirm the dismissal of this claim." (citations omitted)); *Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163, 169-70 (3d Cir. 2015) (agreeing with the Second and Eighth Circuits that "Title II of the ADA does not provide for suits against state officers in their individual capacities"). Accordingly, none of the individual Defendants are subject to individual liability under Title II of the ADA. As such, these claims will be dismissed without leave to amend as any such amendment would be futile.

### 3. Brown's Official Capacity ADA Claims against Defendants

Only Dr. Monsalud and Dr. Newton specifically address Brown's official capacity ADA claims against them. (Docs. 19, 25.) Dr. Monsalud and Dr. Newton argue that they are not "public entities" under Title II of the ADA. *See* Docs. 19, 25. The court agrees, as their roles as private medical and mental health contractors with the DOC do not make them "public entities" under Title II of the ADA. *See Matthews*, 613 F. App'x at 169–70 (a contract medical provider of medical services to various state prisons is not a "is not a public entity merely because it contracts with a public entity to provide some service.") Therefore,

Brown's ADA official capacity claims against Dr. Monsalud and Dr. Newton will be dismissed with prejudice as any amendment would be futile.

CHCA Holly does not specifically address Brown's official capacity ADA claim.  Instead, she asserts she cannot be sued under Title II of the ADA because "violations of the ADA cannot be asserted against individuals, such as Defendant Karen Holley, and therefore, this claim should be decided in favor of the Defendant.  Simply put, she is not a public entity, and as a result, cannot be held liable."  Doc. 17, p. 8; *see also* Doc. 61, p. 4.  Although CHCA Holly herself is not a "public entity" and therefore cannot be sued for monetary damages in her individual capacity, *supra*, she may still be sued in her official capacity for prospective injunctive relief and monetary damages. [3]

The Third Circuit Court of Appeals has held that a state official may be sued in his or her official capacity when prospective injunctive relief is sought for ongoing violations of the ADA.  This is because at its core, the claim is against "entities for which an officer is an agent."  *Koslow v. Pennsylvania*, 302 F.3d 161, 178–79 (3d Cir. 2002) ("[F]ederal ADA claims for prospective relief against a state official in their official capacity is "authorized by the *Ex Parte Young* doctrine.").  Additionally, the United States Supreme Court has held that Title II of the ADA

---

[3] Punitive damages are not available under Title II of the ADA.  *See Bowers v. Nat'l Collegiate Athletic Ass'n*, 346 F.3d 402, 429 (3d Cir. 2003) (citing *Barnes v. Gorman*, 536 U.S. 181, 187 (2002)).

abrogates state sovereign immunity and allows an inmate to bring a claim for money damages against the State "for conduct that *actually* violates the Fourteenth Amendment." *United States v. Georgia*, 546 U.S. 151, 159 (2006) (emphasis in original). Again, CHCA Holly is a State employee.

To evaluate whether a plaintiff has presented an ADA claim premised on conduct that does not independently violate the Fourteenth Amendment, district courts must, "on a claim-by-claim basis" determine "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." (*Id.*; *see also Geness v. Admin. Office of Pa. Courts*, 974 F.3d 263, 274 (3d Cir. 2020)). As CHCA Holly's defense to Brown's Title II ADA claim did not address the official capacity ADA claim against her, the court will not engage in a *sua sponte* review of the *Georgia* factors without input from the parties. Therefore, Brown's official capacity claims against CHCA Holly will not be dismissed.

**B.   Brown's Eighth Amendment Medical Claims**

A prison official or healthcare provider violates the Eighth Amendment by "acts or omissions sufficiently harmful to evidence deliberate indifference to

serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  In the prison

context, an Eighth Amendment claim of deficient medical care must demonstrate

two elements:  1) an objectively serious medical condition; and 2) an official's

deliberate indifference to that condition.  *See Ryle v. Fuh*, 820 F. App'x 121, 123

(3d Cir. 2020) (citing *Estelle*, 429 U.S. at 104).  A medical need is serious if it "has

been diagnosed by a physician as requiring treatment or one that is so obvious that

a lay person would easily recognize the necessity for a doctor's attention."

*Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)

(internal quotation omitted).  "To act with deliberate indifference to serious

medical needs is to recklessly disregard a substantial risk of serious harm." *Giles

v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009).  To constitute deliberate

indifference, "the official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw

the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

The United States Court of Appeals for the Third Circuit has found deliberate

indifference where a prison official knows of an inmate's need for medical care

and intentionally refuses to provide it, delays it for non-medical reasons, or

prevents the prisoner from receiving needed or recommended treatment.  *See

Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1992).  Circumstantial evidence can

establish the subjective knowledge requirement if it shows that the excessive risk

was so obvious that the official must have known about it.  *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer,* 511 U.S. at 842)).

Generally, courts accord prison medical providers "considerable latitude in the diagnosis and treatment of prisoners," *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993), and "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment … [which] remains a question of sound professional judgment." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)) (alternations in original).

As such, prisoners do not have the right to choose their medical treatment, *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. 2010) (citing *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000)), and their disagreement with a prison medical professional's judgment, or a difference of medical opinion between two physicians does not demonstrate an Eighth Amendment violation because "[t]here may … be several acceptable ways to treat an illness."  *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990).  "[W]hen medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care."  *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017).

However, "there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir 2017). "[P]rison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition." *Id.* (citations and internal quotations marks omitted). They cannot "deny reasonable requests for medical treatment …[when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Id*. (citing *Monmouth Cnty. Corr. Inst. Inmates*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)).

Accordingly, a diagnosis or treatment provided, even if incorrect, without the requisite accompanying culpable state of mind does not rise to the level of a constitutional violation. *Estelle*, 429 U.S. at 106; *Farmer*, 511 U.S. at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause…" *Whitley v. Albers*, 475 U.S. 312, 319 (1986). With that said, "[i]f a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official ... will not be chargeable with the Eighth Amendment scienter

14

requirement of deliberate indifference." *Id.* Where a state of mind is relevant, as with a claim of deliberate indifference, the complaint is inadequate if it merely contains conclusory allegations describing the defendant's requisite state of mind such as "intentionally" or "recklessly" without supporting factual allegations. *Wilson v. Seiter*, 501 U.S. 294, 297–98 (1991); *Pearson,* 850 F.3d at 539.

Here, in order to allege a cognizable Eighth Amendment violation, Brown is required to plead facts showing that he suffered from a sufficiently serious medical need, that Defendants were subjectively aware of facts from which the inference could be drawn that failure to provide treatment for that need posed a substantial risk of serious harm or undue suffering, and that they drew that inference but disregarded the risk anyway. In his complaint, Brown asserts that Defendants were deliberately indifferent to his serious eye conditions when he "was not permitted to use" his prescription eye drops between June 2019 until July 2019 unless he kept his medication in his cell. (Doc. 1-3, ¶ 17.) As a result of Defendants' action, Brown claims he was exposed to a significant risk of harm and "went blind in [his] right eye." (Doc. 1-3, ¶¶ 14.)

Dr. Monsalud argues she exercised her professional judgment when determining Brown should keep his medication in his cell rather than return periodically throughout the day to receive his eye drops. She adds that Plaintiff "has not alleged that [she] refused to provide him with medical treatment that he

needed, but rather disagrees with the manner in which that treatment was provided over a one-month period." (Doc. 19, p. 13.) Brown counters that Dr. Monsalud was aware of his extensive mental health history, past suicide attempts, and need for his vision sustaining medication. Given her knowledge of this information, he claims she was deliberately indifferent to his serious medical needs by altering his access to that medication in a manner she knew placed him at substantial risk of harm due to his particular vulnerability of suicide[4] or denied him of his medically prescribed medication.

Under these unique circumstances, Dr. Monsalud's change in the method of delivery of Brown's medication could be construed as deliberately indifferent to his serious medical needs. *See Colburn v. Upper Darby Township*, 838 F.2d 663 (3d Cir. 1988) (Establishing vulnerability to suicide as a serious medical need); *see also Palakovic*, 854 F.3d at 224. Given Brown's allegations, the court concludes he has set forth a plausible Eighth Amendment claim against Dr. Monsalud. Her motion to dismiss this claim will be denied.

Dr. Newton seeks dismissal of Brown's Eighth Amendment claim because "Plaintiff has failed to adequately allege [his] involvement in the care received

---

[4] To maintain such an Eighth Amendment claim, Plaintiff must set forth facts suggesting that (1) he "had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to [his] particular vulnerability." *See Hinton v. Mark*, 544 F. App'x 75, 77 (3d Cir. 2013) (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991)).

associated with the prescription and administration of eye drops which forms the basis of his Eighth Amendment claim." (Doc. 25, p. 5.)  He adds that he "did not personally direct or, in the alternative, have actual knowledge and acquiescence in the prescription and method of administration of Plaintiff's eye drops." (*Id*.)  Dr. Newton asks the court to look outside the four corners of the complaint and consider his affidavit filed in opposition to Brown's motion for injunctive relief to support his asserted lack of involvement in decisions regarding the delivery of Brown's medical care. (*Id*.)  However, Dr. Newton provides no caselaw that would allow the court to do so on a motion to dismiss.  In the complaint, Brown avers that on June 7, 2019, Dr. Newton and the other Defendants "was waiting for plaintiff" and "tell plaintiff if he don't take his medication back to his cell then he don't get nothing," Plaintiff has alleged the personal involvement of Dr. Newton in the events of June 7, 2019. (Doc. 1-3, ¶ 13.)  Accordingly, Dr. Newton's motion to dismiss Brown's Eighth Amendment claim based on the lack of allegations of his personal involvement will be denied.

Next, the court will consider CHCA Holly's motion to dismiss Brown's Eighth Amendment medical claim.  The court agrees that CHCA Holly is considered a non-medical defendant. *See Fantone v. Herbik*, 528 F. App'x 123, 128, n. 6 (3d Cir. 2013) (Defendant, although a registered nurse, "while acting as the Corrections Health Care Administrator [ ] acted in a purely administrative role

and did not provide direct medical treatment to inmates.")  As such, she claims she was not personally involved in the decision to modify the method of delivery of Brown's medication.  Even if this is true, Brown alleges that CHCA Holly was familiar with his mental health issues and particular vulnerability to suicide attempts with prescription medications.  Also, she was aware that prior to June 7, 2019, all his medications were taken in the medical unit under the direct observation of staff.  Given this alleged knowledge, the court finds that Brown has adequately alleged that CHCA Holly had a reason to believe, if not actual knowledge, that the change to Brown's medication delivery exposed him to a substantial risk of harm due to his mental health conditions or would result in the denial of his necessary ophthalmic medication.  *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).  Based on the allegations of the complaint, Brown's Eighth Amendment claim against CHCA Holly will not be dismissed.

### C.   Brown's State Law Claim for Intentional Infliction of Emotional Distress

Brown alleges all three Defendants caused him to suffer "severe emotional distress, anxiety, and fear" when they "fail[ed] to provide him the use of his prescribed eye drops or other means of adequately using his drops safely for a month." (Doc. 1-3, ¶¶ 35, 40.)  As a result, he claims he lost the vision in his right eye. (*Id.,* ¶ 14.)  Defendants' knowledge of his mental health issues and suicide attempts with his medications makes their decision to withhold his eye drops if he

18

did not agree to take them back to his cell, knowing he "would go blind without [them] …[and] that [his] transplant would then reject without the drops" makes their behavior extreme and outrageous.  (Doc. 60.)  In response, all Defendants argue that Brown's IIED claim fails as a matter of law.  CHCA Holly argues Brown's IIED claim "is a textbook example" of conclusory allegations not to be credited with the assumption of truth.  (Doc. 17, p. 9; Doc. 61, p. 4.)  She adds that there are "no facts alleged which demonstrate extreme and outrageous conduct, and surely no facts which link any actions by" her to such conduct.  (Doc. 17, p. 9.) Dr. Monsalud contends that Brown's disagreement with the method of delivery of his medication does not rise to the level of an IIED claim as well as Brown's failure to plead that his emotional distress manifested as a physical injury.  (Doc. 19, pp. 9–10.)  Dr. Newton reasons that because Brown's IIED claim "relates to the administration of medications associated with medical, rather than psychiatric treatment, not within [his] direction or control" it fails as a matter of law.  (Doc. 25, p. 11.)

Although the Pennsylvania Supreme Court has not recognized a cause of action for intentional infliction of emotional distress, the Pennsylvania Superior Court has recognized this cause of action.  *Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010); *see also Capresecco v. Jenkintown Borough*, 261 F. Supp. 2d 319, 323 (E.D. Pa. 2003) ("Pennsylvania courts have 'signaled their acceptance of this

evolving tort,' and that it may be applied as part of Pennsylvania common law."
(quoting *Williams v. Guzzardi*, 875 F.2d 46, 50 (3d Cir. 1989)).   To prevail on an
IIED claim, the plaintiff must "at the least, demonstrate intentional outrageous or
extreme conduct by the defendant, which causes severe emotional distress to the
plaintiff" and results in "some type of [ ] physical harm."   *Reedy*, 615 F.3d at 231;
*see also Corbett v. Morgenstern*, 934 F. Supp. 680, 684–85 (E.D. Pa. 1996)
(finding that symptoms of severe depression, nightmares, stress, and anxiety,
requiring psychological treatment, and ongoing mental, physical, and emotional
harm sufficiently state physical injury).   Pennsylvania courts have found liability
on intentional infliction of emotional distress claims only "where the conduct has
been so outrageous in character, and so extreme in degree, as to go beyond all
possible bounds of decency, and to be regarded as atrocious, and utterly intolerable
in a civilized community."   *Field v. Phila. Elec. Co.*, 565 A.2d 1170, 1184 (Pa.
Super. Ct. 1989).   Generally, liability is only found where "the case is one in which
the recitation of the facts to an average member of the community would arouse
his resentment against the actor, and lead him to exclaim, 'Outrageous!'"
Restatement (Second) of Torts § 46 comment d.

Viewing the factual allegations in the complaint in the light most favorable to
Brown, the court finds he has sufficiently set forth an IIED claim against all
Defendants.   Brown suffers from severe mental illness, glaucoma, and is a corneal

transplant recipient.  His propensity to use prescribed medications for self-harm has necessitated the dispensation of all medication, including his eye drops, in the medical unit under direct supervision.  Defendants altered that historical practice on June 7, 2019.  It could be argued that Defendants' ultimatum to Brown that day denied him a safe environment to take his glaucoma and anti-rejection drops without any regard for his particular vulnerability to self-harm.  Brown's claim that Defendants withheld his eye drops of 30 days resulting in the loss of vision in his right eye, if proven, are sufficiently extreme and outrageous to support an IIED claim. [5] *See Rodriguez v. Smith*, No. 03-3675, 2005 WL 1484591, at *9 (E.D. Pa. June 21, 2005) (denying motion to dismiss IIED claim against prison doctor who allegedly refused to provide medically necessary treatment for plaintiff's brain tumor, and then verbally abused him when he sought treatment).

---

[5] All three Defendants argue that Brown "admits" he received his drops, and thus his argument boils down to a disagreement over medical treatment.  However, no Defendant provides a valid citation to the complaint which supports this statement.  Without reference to the complaint, CHCA Holly states that "Plaintiff admits that he was provided with his prescription eye drops." (Doc. 17, p. 12.)  Similarly Dr. Monsalud argues "Plaintiff admits that he was provided with his prescription eye drops." (Doc. 19, p. 9.)  Citing ¶ 13 of the complaint, Dr. Newton claims "Plaintiff appears to allege that he was provided with eye drops, to keep in his cell, to self-administer rather than to have DOT in the medical department." (Doc. 25, p. 8.)  Paragraph 13 is Brown's statement of the Defendants' ultimatum.  More to the point, Defendants ignore Brown's averment that "[f]rom June 2019 until July 2019 the plaintiff was not permitted the use of his drops until  Gov. Tom Wolf Office made the Defendants comply with the grievance final decision."  (Doc. 1-3, ¶ 17.)  The court finds no basis for Defendants' assertion that Brown admitted in the complaint he was provided meaningful access to his medication between June 2019 and July 2019.

Additionally, Pennsylvania courts are more inclined to permit recovery for IIED "when there is a continuing course of conduct." *Williams*, 875 F.2d at 52. Here, Brown's medication was withheld for one month and resulted in his loss of vision in one eye.  Given Brown's reliance upon Defendants as the sole source of his medical care, if proven, Defendants' behavior could be construed as intentional as well as extreme and outrageous.  To the extent Defendants argue that Brown does not assert a claim of physical harm that must accompany the emotional distress the court disagrees as ongoing mental and emotional harm are compensable injuries. *See Corbett*, 934 F. Supp. at 684–85.  Given Brown's pre-existing significant mental illness which automatically triggers monitoring by mental health staff (and perhaps treatment), the court finds Brown has satisfied the harm requirement as his already fragile mental health was negatively impacted by Defendants' alleged actions.  Whether Brown will be able to substantiate these allegations is unknown at this time.  However, currently, he has alleged facts and circumstances which are sufficient to withstand the motions to dismiss this claim.

## CONCLUSION

For the reasons detailed herein, Brown's individual and official capacity claims under Title II of the ADA against Dr. Monsalud and Dr. Newton will be dismissed with prejudice.  Plaintiff's ADA claim against CHCA Holly in her individual capacity will also be dismissed with prejudice.  Brown's official

capacity ADA claim against CHCA Holly is not subject to dismissal.  The

Defendants' motions to dismiss Brown's Eighth Amendment medical and state law

intentional infliction of emotional distress claims will be denied.  An appropriate

order will follow.

s/ Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated:  September 30, 2021