## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEITH S. BROWN, | : | Civil No. 1:20-CV-00849 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DR. MARY JOY MONSALUD, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## **MEMORANDUM**

Before the court are Defendants' motions for summary judgment.  (Docs.

175, 186, 190.)  Defendants have established that Plaintiff disagreed with medical

staff at the State Correctional Institution Frackville ("SCI-Frackville") regarding

the self-administration of his eye drops and his refusal to keep the eye drops on his

person.  Plaintiff then refused to take his medication despite medical staff at SCI-

Frackville continually making the medications available.  Plaintiff then alleges that

he lost sight in his right eye due to this lack of eye drops.  Plaintiff further asserts

that Defendants' request to keep his eye drops on his person violated his Eighth

Amendment rights due to a heightened risk of suicide.  However, Plaintiff has

failed to demonstrate that any self-harm resulted from Defendants' attempts to

have him keep his eye drops on his person.  Therefore, the court will grant

Defendants' motions and enter judgment in favor or Defendants.

Also pending are Plaintiff's motion in opposition of Defendant Karen Holly's statement of facts, a motion for a preliminary injunction and temporary restraining order, and a motion to appoint counsel. (Docs. 198, 199, 211.) It appears that Plaintiff's motion in opposition is mistitled and is construed as a brief in opposition. (Doc. 198.) Plaintiff's motions for a preliminary injunction and temporary restraining order and for appoint of counsel will be denied.

## PROCEDURAL HISTORY

Plaintiff initiated this action by filing a complaint on May 1, 2020 in the Court of Common Pleas of Schuylkill County. (Doc. 1-3.) The complaint named Dr. Mary Joy Monsalud ("Monsalud"), Dr. Newton ("Newton"), and Karen Holly ("Holly") as Defendants. (*Id*.) On May 26, 2020, Defendants removed the action to this court. (Doc. 1.) Defendants, who are all represented by separate counsel, filed motions to dismiss. (Docs. 7, 18, 24.) Following briefing, the court entered an order granting the motions in part. (Docs., 80, 81.) The surviving claims include an Eighth Amendment deliberate indifference claim against all Defendants, an intentional infliction of emotional distress claim against all Defendants, and a claim under the Americans with Disabilities Act (ADA) against Defendant Holly in her official capacity. (Doc. 81.)

Defendants have answered the complaint regarding the surviving claims. (Docs. 83, 84, 85.)

Following fact discovery, Defendants filed motions for summary judgment. (Docs. 175, 186, 190.)  Plaintiff filed responses in the form of brief in opposition and a "Motion . . . In opposition to Defendant Karen Holly Undisputed Facts," which appears to be a mistitled brief in opposition.  (Docs. 189, 198, 205.)  The court will address each motion for summary judgment in turn.

Additionally, Plaintiff filed a motion for a preliminary injunction, and temporary restraining order.  (Doc. 199.)  Defendants have filed briefs in opposition.  (Docs. 204, 206, 208.)  Plaintiff filed a reply.  (Doc. 210.)  The court will also address this pending motion.

Finally, on February 23, 2024, Plaintiff filed a motion for appointment of counsel.  (Doc. 211.)

### JURISDICTION AND VENUE

The court has jurisdiction over Plaintiff's action pursuant to 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States.  Venue is proper in this district because the alleged acts and omissions giving rise to the claims occurred at SCI-Frackville, located in Schuylkill County, Pennsylvania, which is located within this district.  *See* 28 U.S.C. § 118(b).

## MOTION FOR SUMMARY JUDGMENT STANDARD

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**DISCUSSION**

## A. Defendant Newton's Motion for Summary Judgment Will Be Granted.

Defendant Newton asks the court to grant summary judgment in his favor because Plaintiff's Eighth Amendment deliberate indifference claim and the intentional infliction of emotion distress claim fail as a matter of law for three reasons: (1) Defendant Newton made a timely psychiatric assessment that Plaintiff could hold and apply eye drops in his cell; (2) Plaintiff "provided no competent evidence that Dr. Newton's multiple psychiatric assessments of Plaintiff were outside the standard of care, let alone, deliberately indifferent, reckless or intentionally wrong; and (3) Plaintiff failed to provide competent medical evidence that the cause of the alleged loss of vision in his right eye was the alleged deprivation of his eye drops. (Doc. 176, p. 5.)[1] Additionally, Defendant Newton seeks summary judgment on the intentional infliction of emotional distress claim because he did not act in an extreme and outrageous manner. (*Id*., pp. 15–16.)

### 1. Statements of Facts

Defendant Newton failed to attach a separate statement of facts as set forth in the Local Rules, and merely provides a summary of Plaintiff's January 10, 2019 deposition. (Doc. 176.) Attached to the motion for summary judgment are the

---

[1] For ease of reference, the court utilizes page numbers from the CM/ECF header.

transcript of the deposition, Defendant Newton's affidavits, and Defendant Newton's treatment records concerning Plaintiff. (Doc. 175-2.)

In his deposition, Plaintiff stated that on or about June 7, 2019, Defendants gave him an ultimatum that he must either take his medication, including his eye drops, back to his cell "or [he would not] get anything." (*Id.*, p. 2.) Plaintiff stated that he saw Defendant Newton after this ultimatum, and "he was agreeing with them." (*Id.*) Plaintiff testified that he was not allowed to hold medications, including eye drops, in his cell because of his psychiatric history of suicide attempts, and in refusing to do so, he was complying with his paperwork. (*Id.*) Plaintiff stated that he swallowed eye drops to kill himself in 1999, 2001 or 2002, 2008, 2009 and/or 2010, and 2019. (*Id.*, p. 3.) This paperwork is identified as the Final Appeal Decision for Grievance No. 592113, and was attached to his complaint. (*Id.*, pp. 2–3.) The Final Appeal Decision is dated March 23, 2016 and states, in relevant part:

> Your concern of not being capable of self-administering your glaucoma eye [drops] based on your history and risk of self-harm was reviewed by staff at the Bureau of Health Care Services. The Bureau of Healthcare Services reviewed the medical record and determined the medical care provided was reasonable and appropriate. The findings of this review concur with the initial review response dated 11/27/15. You are encouraged to participate in your treatment plan to self-administer your eyedrops under supervision of the medical staff in the medical department. No evidence of neglect or deliberate in difference has been found.

(Doc. 1-2, p. 41.)  Plaintiff stated in his deposition that the sentence "[y]ou are encouraged to participate in your treatment plan to self-administer your eyedrops under supervisor of the medical staff in the medical department" meant that he was not allowed to hold medications in his cell.  (Doc. 176, p. 3.)  He stated that he believed that this March 2016 decision was controlling in June and July of 2019. (*Id.*)

Plaintiff stated that he knew he lost vision in his right eye because he was deprived of his eye drops.  (*Id.*, p. 4.)  He also stated that after June 7, his nephew called Governor Wolf's office and reported that Plaintiff was being deprived of his eye drops.  (*Id.*)  He stated that the Governor's office called SCI-Frackville, and after that call Plaintiff was allowed to self-administer his eye drops in the medical department of the prison.  (*Id.*)

While Defendant Newton failed to include the required summary of facts, the court will now summarize the medical records attached to his motion for summary judgment.  On May 27, 2019, Defendant Newton saw Plaintiff in the clinic after Plaintiff's treatment had been transferred following concerns he was stalking his prior provider, Ms. Dempsey.  (Doc. 172-5, p. 115.)  His mental status exam was normal and he was to return to the clinic in ten to twelve weeks for a routine follow up.  (*Id.*, pp. 115–17.)

On July 1, 2019, Defendant Newton saw Plaintiff in an unscheduled visit because he was not administered his eye wash solution and was asked to keep it in his cell. (*Id*., p. 120.) Plaintiff reported to Defendant Newton that his reason for not keeping it was because of his behaviors, and he reported a long history of suicidal behaviors through swallowing foreign objects. (*Id*.) Defendant Newton stated "I do not understand his ulterior motive for having to come to medical each time he wats to apply the solution. Nevertheless[,] I told him I will address his concerns with the CHCA via email." (*Id*.) Plaintiff was assessed as being psychiatrically stable. (*Id*.)

On July 11, 2019, Defendant Newton entered a note in Plaintiff's record stating that Plaintiff and his need to report to medical to have the eye drops administered under direct observation were discussed with the CHCA Holly. (*Id*., p. 123.) Defendant Newton states "there is no reasons for this as he can take he [e]ye drops to his cell which he is refusing to do. I sent for him and block Sgt cracked his door open and when he discovered it was raining he refused to come down. When the rain stopped he refu[s]ed to come down as well." (*Id*.)

On July 15, 2019, Defendant Newton again saw Plaintiff and made the following note:

> He is insisting that he comes to the Medical Dept, so many times daily for the Nurses to apply his eyedrops instead of him having the eyedrops inside of his cell. The logic he claimed was years ago when he becomes impulsive he would swallow metallic objects and that he could not

guarantee it.  Since arriving in this facility there has not been any incident of him swallowing foreign objects.  Three Times he was scheduled to be seen by the ophthalmologist for the treatment of his Right eye glaucoma and he refused all three times.  This surgery would have helped significantly his eyesight and possibly diminish the use of the eyedrops.  He also refused to be seen by the site medical Director Dr. Monsalud.  This inmate has history of stalking female staff and engaging in inappropriate behaviors towards females.  His motive perhaps would be to come to medical for the application of the eye drops by the Nurses.  There is some anecdotal evidence that he rubbed self against female nurses in the past, he is on Trilafon  8mg po HS for intermittent explosive disorder.  Furthermore application of the eye drops had to be done at about 5 minutes interval and having the eye drops in his cell will offer him more appropriate time.

(*Id.*, p. 126.)  Defendant Newton further states: [f]rom a reasonable degree of medical and psychiatric certainty there is no reason why he cannot apply the eye drops by himself in his cell," and "[t]here is no psychiatric reason why he cannot keep his eyedrops inside his cell as KOP[2] to have it applied by himself."  (*Id.*, pp. 127–28.)

Defendant Newton provided an affidavit, which states "I have not and do not determine whether medications to treat Mr. Brown's physical conditions: 1) should be kept on his person and self-administered, 2) should be administered by the medical department, or 3) should be self-administered under the observation of the medical department."  (*Id.*, p. 109.)

---

[2] The acronym KOP stands for "keep on person."  (Doc. 176, p. 5.)

Plaintiff's brief in opposition to Defendant Newton's motion for summary judgment includes a statement of facts.  (Doc. 189, pp. 1–3.)  However, he did not materially dispute the facts set forth by Defendant Newton nor the evidence Defendant Newton provided.  (*Id*.)  His brief in opposition appears to address all Defendants, not just Defendant Newton and appears to concern all claims raised in the complaint, including those previously dismissed with prejudice by the court.  (*Id*., pp. 1–14.)  Plaintiff appears to focus on the knowledge that each Defendant had of his "mental health issue and particular vulnerability to suicide attempts with his prescription medications including eye drops."  (*Id*., p. 4.)  Plaintiff did attach historical medical evidence in support of his assertion of the preexisting mental health diagnoses.  (Doc. 189-1, pp. 11–23, 27–49, 77–78.)  He also submitted what appears to be the final page of medical treatment records concerning his eyes.  (*Id*., pp. 24–26.)  He also includes the March 23, 2016 Final Appeal Decision issued while he was housed at SCI-Smithfield cited above.  (*Id*., p. 51.)  Plaintiff attached the grievances he filed concerning the facts alleged in this action.  (*Id*., pp. 52–57, 69, 75–76.)  Plaintiff also attached the responses to his interrogatories by Defendant Holly (*Id*., pp. 58–68.)  Plaintiff also attached historical grievance documents regarding his medication distribution from 2013 and 2015.  (*Id*., pp. 70–74.)

## 2.  Eighth Amendment Claim

A prison official or healthcare provider violates the Eighth Amendment by "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  In the prison context, an Eighth Amendment claim of deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition.  *See Ryle v. Fuh*, 820 F. App'x 121, 123 (3d Cir. 2020) (citing *Estelle*, 429 U.S. at 104).  A medical need is serious if it "has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation omitted).  "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009).  To constitute deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

The United States Court of Appeals for the Third Circuit has found deliberate indifference where a prison official knows of an inmate's need for

medical care and intentionally refuses to provide it, delays it for non-medical reasons, or prevents the prisoner from receiving needed or recommended treatment. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1992). Circumstantial evidence can establish the subjective knowledge requirement if it shows that the excessive risk was so obvious that the official must have known about it. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer,* 511 U.S. at 842).

Generally, courts accord prison medical providers "considerable latitude in the diagnosis and treatment of prisoners," *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993), and "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)) (alternations in original).

As such, prisoners do not have the right to choose their medical treatment, *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. 2010) (citing *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000)), and their disagreement with a prison medical professional's judgment, or a difference of medical opinion between two physicians does not demonstrate an Eighth Amendment violation because "[t]here may . . . be several acceptable ways to treat an illness." *White v. Napoleon*, 897

F.2d 103, 110 (3d Cir. 1990). "[W]hen medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017).

However, "there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir 2017). "[P]rison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition." *Id.* (citations and internal quotations marks omitted). They cannot "deny reasonable requests for medical treatment . . . [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Id.* (citing *Monmouth Cnty. Corr. Inst. Inmates*, 834 F.2d at 346).

Accordingly, a diagnosis or treatment provided, even if incorrect, without the requisite accompanying culpable state of mind does not rise to the level of a constitutional violation. *Estelle*, 429 U.S. at 106; *Farmer*, 511 U.S. at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . ." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Here, Defendant Newton has presented evidence that, as of the period at issue in 2019, Plaintiff's psychological conditions did not preclude maintaining his

eye drops in his cell for self-administration.  Plaintiff has not presented

contemporary evidence to the contrary.  Instead, Plaintiff has presented remote

historical medical evidence of his mental health impairments and historical

grievances regarding the issue of medication distribution at other facilities.

Therefore, Plaintiff's claim appears to be solely a disagreement with Defendant

Newton as to his medical treatment while housed in SCI-Frackville in 2019.  And a

mere disagreement with treatment does not rise to the level of an Eighth

Amendment claim.  *White*, 897 F.2d at 110.

The court notes that both parties cite the heightened standard of deliberate

indifference related to Plaintiff's vulnerability to suicide in their briefing.  (Doc.

176, p. 8; Doc. 189, pp. 12–13.)  The Third Circuit has recognized a heightened

standard for deliberate indifference when a plaintiff seeks to hold prison officials

or medical staff accountable for failing to prevent a prison suicide known as the

"vulnerability to suicide" framework.  *Palakovic*, 854 F.3d at 222.  While this

framework has been extended to plaintiffs who have attempted suicide and

survived, *Myers v. Clinton County Correctional Facility*, No. 3:21-CV-00867,

2023 WL 811771, *2–3 (M.D. Pa. July 11, 2023), it has not been extended to a

plaintiff who has suffered no self-harm.

In this case, Plaintiff does not allege he suffered any self-harm resulting

from any actions or inactions of any of the Defendants.  Instead, he alleges that

after he refused to take his eye drops back to his cell, he was denied his eye drops and the lack of eye drops caused blindness in his right eye.  While the court stated that Plaintiff's allegations could be construed as deliberate indifference to his vulnerability to suicide in its September 30, 2021 order, Doc. 80, p. 16, the evidence submitted in support of Defendant Newton's summary judgment motion does not establish the need to apply the increased standard as there is no evidence that self-harm or a suicide attempt occurred.

Defendant Newton's motion for summary judgment will be granted as to the Eighth Amendment deliberate indifference claim.

### 3.  Intentional Infliction of Emotional Distress Claim

Defendant Newton seeks summary judgment on the intentional infliction of emotions distress claim as well.

A claim for intentional infliction of emotional distress under Pennsylvania law requires a plaintiff to establish four elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe."  *Bruffett v. Warner Commc'ns, Inc.*, 692 F.2d 910, 914 (3d Cir. 1982).

Defendant Newton alleges that his conduct did not rise to the level of extreme and outrageous.  (Doc. 176, pp. 15–16.)  Upon review of the evidence submitted, the court agrees.  There is no evidence that Defendant Newton refused

Plaintiff his eye drops.  Instead, the record demonstrates that Defendant Newton conducted a psychiatric evaluation and found that there was no psychiatric reason Plaintiff could not keep his eye drops on his person during the relevant period. Therefore, the court will grant Defendant Newton's motion for summary judgment as to the intentional infliction of emotions distress claim.

### B. Defendant Holly's Motion for Summary Judgment Will Be Granted.

The remaining claims against Defendant Holly include an Eighth Amendment deliberate indifference claim, a claim under the ADA in her individual capacity, and an intentional infliction of emotional distress claim. (Doc. 80.)  She seeks summary judgment on all three claims.

### 1. Defendant's Holly Statement of Facts

Defendant Holly included a separate statement of facts as required by the Local Rules, but rather than summarizing the undisputed factual evidence, Defendant Holly set forth statements in the negative phrasing asserting what Plaintiff could not prove.  (Doc. 187.)  Defendant Holly also attached multiple documents, including Plaintiff's cell history, Doc. 187-1, DOC Policy Number 13.2.1. Doc. 187-2, Plaintiff's medication administration notes from June 1, 2019 through June 30, 2019, Doc. 187-3, Routine Medication Administration Notes from June of 2019, Doc. 187-4, and Plaintiff's medical records form April 3, 2018 through July 30, 2019, Doc. 187-5.

The June 2019 Medication Administration Notes demonstrate that Plaintiff was able to administer his eye drops himself without difficulty on June 7, 2019. (Doc. 187, p. 5; Doc. 187-3, p. 1.)  The medical records show that in June of 2019, Plaintiff had eight different eye drops prescribed: (1) Moxifloxacin; (2) Rhopressa; (3) Azopt; (4) Brimonidine; (5) Latanoprost; (6) Lotemax; (7) Sodium Cl 5% hypertonic; and (8) Timolol.  (Doc. 187, p. 5; Doc. 187-4.)  In that month, Plaintiff missed two doses of Moxifloxacin by no-showing to the 8:15 a.m. dose on June 8, 2019 and refusing the 3:00 p.m. dose on the same day.  (Doc. 187, p. 5; Doc. 187-4, p. 1.)  The Moxifloxacin was stopped on June 14, 2019.  (Doc. 187-4, p. 1.)  Plaintiff did not miss a single dose of the Rhopressa.  (Doc. 187, p. 5; Doc. 187-4, p. 1.)  This medication was stopped on June 17, 2019.  (Doc. 187-4, p. 1.)  Plaintiff refused the 3:00 p.m. dose of Azopt on June 8, 2019.  (Doc. 187, p. 1; Doc. 187-4, p. 2.)  However, there are no dosing notes for this medication from June 26, 2019 and forward.  (Doc. 187-4, p. 2.)  Plaintiff missed the 3:00 p.m. dose of Brimonidine on June 8, 2019.  (Doc. 187, p. 5; Doc. 187-4, p. 2.)  Again, there are no dosing notes for this medication from June 26, 2019 and forward.  (Doc. 187-4, p. 2.)  Plaintiff did not miss any doses of the Latanoprost, Lotemax, and Timolol in June 2019.  (Doc. 187, p. 6; Doc. 187-4, pp. 3–4.)  However, there are no dosing notes for these medications from June 26, 2019 and forward.  (Doc. 187-4, pp. 3–4.)  Plaintiff no-showed for nine does of the Sodium Cl 5% hypertonic and also

refused two doses in June of 2019.  (Doc. 187, p. 6; Doc. 187-4, p. 4.)  Plaintiff no-showed for the 11:30 a.m. dose from June 7 through 11, 2019, and again on June 13, 16, 20, and 21, 2019.  (Doc. 187-4, p. 4.)  Plaintiff also refused the eye drops at the 3:00 p.m. dose on June 8, 2019 and the 11:30 a.m. dose on June 14, 2019.  (*Id*.)  Again, there are no administration notes for these medications from June 26, 2019 and forward.  (*Id*.)

The medical records submitted by Defendant Holly demonstrate that Plaintiff had no incidents of swallowing foreign objects since his arrival at SCI-Frackville.  (Doc. 187, p. 6; Doc. 187-5.)

The treatment notes demonstrate that on June 7, 2019, Defendant Monsalud stated that Plaintiff needed to sign a refusal form for surgery for his severe glaucoma, and needed to discuss medication non-compliance and the requirement that his eyedrops be kept on his person.  (Doc. 187-5, p. 83.)  However, Plaintiff refused to see Defendant Monsalud.  Defendant Holly spoke with him in the hallway, and told him that he will now start applying his eyedrops in his cell because there is a 5-minute interval after each drop for proper absorption.  (*Id*.)  Plaintiff refused to take the eye drops with him.  (*Id*.)  In a referral to psychology, Defendant Monsalud stated that Plaintiff had refused surgery to preserve his vision in his right eye three times.  (*Id*., p. 84.)  Included in the medical records are multiple releases from responsibility for medical treatment showing that Plaintiff

refused surgery to relieve pressure in his right eye three times, refused his medications to treat glaucoma, hypertension, and high cholesterol, refused a vaccination for pneumonia, refused two prostate screenings, refused treatment for his leg twice, refused trimming his toenails, and refused all dental care.  (*Id.*, pp. 9–10, 11–12, 14, 38–39, 58–59, 79–80, 86–87, 108-09, 145–46, 152–53, 220–21, 251–52, 281–82, 304, 421–22.)  In all but two instances, Plaintiff refused to sign the releases.  (*Id.*)  Specifically, the refusals for eye drops are dated August 31, 2018 and July 17, 2019 and there is a refusal to self-administer his medications on June 29, 2019.  (*Id.*, pp. 11–12, 58–59, 304.)

Plaintiff did not initially respond to Defendant Holly's statement of facts or brief in support.  The court acknowledges that on August 21, 2023, the court received and docketed a document titled "Plaintiff's Brief In opposition to Defendants Monsalud, Newton, Holly Summary Judgment Motion," but this was docketed the same day as Defendant Holly filed her motion for summary judgment.  (Doc. 189.)   The court construes the brief in opposition to only apply to Defendant Newton's motion for summary judgment because Defendant Holly only mailed her motion for summary judgment to Plaintiff on August 21, 2023, meaning that it was not in Plaintiff's possession prior to filing the brief in opposition.  (Doc. 189, p. 2.)

However, on October 24, 2023, the court received and docketed a document tiled "Motion for Inopposition to Defendant Karen Holly undisputed facts." (Doc. 198.)  This is a three-page document introducing 19-pages of medical evidence that Plaintiff alleges demonstrates issues of material facts. (Docs. 198, 198-1.)  However, all medical records prior to July 31, 2019 were submitted as part of Defendant Holly's evidence. (Doc. 198-1, pp. 1–4.)  In addition to the 2019 records, Plaintiff also submitted records from 2020 showing repeated threats to eat his eye drops if staff did not administer them to him on April 7, 2020 and May 4, 2020 (*Id*., pp. 5, 8.)  Following these threats, Plaintiff was placed under observation. (*Id*., p. 10.)

Plaintiff highlights the June 7, 2019 treatment note from Defendant Monsalud in which Defendant Holly spoke with him in the hallway and he refused his medication, which he indicates is evidence that she refused to give him his medications and told him to take a plastic bag full of his meds. (Doc. 198, p. 1; Doc. 198-1, p. 1.)  However, this does not present an issue of material fact.  How the medications were stored, i.e. in a plastic bag or not, is not a material issue in the case.  Additionally, Plaintiff alleges that Defendant Holly said he must either take the medications back to his cell or he gets nothing.  This is not a disputed fact because a mere allegation is not evidence.

Plaintiff also asserts that a July 11, 2019 note by provider Hansen demonstrates that he wanted to attend his appointment with Defendant Newton, but the rain was going to get his paperwork wet.  (Doc. 198, p. 1; Doc. 198, pp. 2–3.)  However, this presents no issue of material facts concerning the claims raised against Defendant Holly.

### 2.  Eighth Amendment Claim

Defendant Holly seeks summary judgment in the pending Eighth Amendment deliberate indifference claim.  In doing so, she points to this court's September 30, 2021 order, which stated that "[t]he court agrees that CHCA Holly is considered a non-medical defendant."  (Doc. 80, p. 17.)

A prison administrator cannot be found deliberately indifferent under the Eighth Amendment because he or she fails to respond to the medical complaints of an inmate being treated by a prison physician, or because, as non-physicians, they defer to the medical judgment of the inmate's treating physicians.  *Durmer*, 991 F.2d at 69.  If, however, non-medical prison personnel had "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner," liability may be imposed.  *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).

While the court agreed that Defendant Holly was a non-medical defendant in its September 30, 2021 order, the court also found that Plaintiff had alleged that

Defendant had knowledge that all of his medications were given under direct observation and that Defendant Holly had a reason to believe a change to Plaintiff's medication delivery exposed him to a substantial risk of harm.  (Doc. 80, pp. 17–18.)  Therefore, the Eighth Amendment claim survived a motion to dismiss.

However, based on the evidence submitted in support of Defendant Holly's motion for summary judgment and Plaintiff's failure to present any evidence to the contrary, the court finds there is no evidence that Defendant Holly had any reason to believe or any knowledge that doctors were mistreating Plaintiff.  In fact, the evidence demonstrates that Defendant Holly spoke with Plaintiff's providers regarding his mental health and that Plaintiff was provided his eye drops during the relevant period.

The medical records demonstrate that Defendant Holly was aware of the change in Plaintiff's medication administration as she instructed him about the change on June 7, 2019, and signed an administrate note summarizing a July 10, 2019 discussion between Plaintiff, Superintendent Assistant Newberry, and Counselor Cintron.  (Doc. 187-5, pp. 36, 83.)  The June 7, 2019 treatment note makes clear that Defendant Holly spoke with Plaintiff following his refusal to keep his eyedrops on his person so he could properly administer them with the required time delay for absorption at the instructions of Defendant Monsalud, a medical

doctor.  (*Id*., p. 84.)  Likewise, Defendant Newton discussed the situation with Defendant Holly on July 11, 2019.  (*Id*., p. 33.)  In that discussion, Defendant Newton, a psychologist, stated that there was no reason Plaintiff could not keep his eye drops on his person in his cell.  (*Id*.)  Additionally, all medical evidence submitted demonstrates that Plaintiff was not suffering from thoughts of self-harm or suicide from the beginning of his stay at SCI-Frackville through the relevant period ending in July of 2019.  (*Id*., pp. 26, 29, 33, 40, 45, 60, 66, 73, 81, 91, 94, 103, 110, 121, 160, 163, 176, 180, 202, 217, 235, 245, 312, 315, 345, 350, 357, 374, 377, 380, 384, 388, 391, 394–95, 407, 419.)  Additionally, the medical records demonstrate that Plaintiff's eye drops continued to be available to him following the June 7, 2019 discussion between Plaintiff and Defendant Holly. (Doc. 187-4.)

In response, Plaintiff has submitted evidence from April and May of 2020 in which he had his medications in his cell and he made threats to use those medications to self-harm.  (Doc. 198-1.)  However, as discussed at length above, the question before the court is whether or not Defendant Holly was deliberately indifferent in refusing Plaintiff access to his eye drops in June and July of 2019. (Doc. 1-3.)  Therefore, Plaintiff's threats of self-harm in 2020 do not establish an issue of material fact.

In conclusion, Defendant Holly has submitted evidence demonstrating that she had no reason to believe that prison doctors were mistreating Plaintiff.  He was provided access to his medications through keeping it on his person and through self-administration and current records demonstrated that at the time Defendant Holly was aware of the changes in the administration of medications, there was no concern of repeating his history of swallowing medications.  Therefore, the court will grant Defendant Holly's motion for summary judgment as to the Eighth Amendment Claim.

### 3.  ADA Claim

Defendant Holly seeks summary judgment on the ADA claim against her in her official capacity.  This claim was not raised in her Rule 12(b)(6) motion.  (Doc. 80, p. 11.)  In her motion for summary judgment, Defendant Holly does not dispute that Plaintiff is a qualified individual with a disability, but asserts that medical decisions do not fall within the scope of the ADA.  (Doc. 188, p. 7.)

"[D]ecisions about a prisoner's medical treatment generally do not give rise to a claim under the ADA."  *Nunez v. Prime Care Health, Inc.*, No. 19-cv-859, 2019 WL 1400466, at *1 n.3 (E.D. Pa. Mar. 27, 2019) (collecting cases).  Indeed, such claims would fail because the ADA and RA "prohibit[ ] disability-based discrimination, 'not inadequate treatment for the disability.'"  *Kokinda v. Pennsylvania Dep't of Corr.*, 663 F. App'x 156, 159 (3d Cir. 2016) (quotation

25

omitted).  Here, the claims raised in Plaintiff's complaint are all premised on his disagreement with the administration of his medical treatment.  Therefore, the court will grant Defendant Holly's motion and enter judgment in her favor on the ADA claim.

### 4.  Intentional Infliction of Emotional Distress Claim

Defendant Holly seeks summary judgment on the tort claim against her, and appears to argue that she has sovereign immunity.  (Doc. 188, p. 8.)

The Commonwealth of Pennsylvania has explicitly retained its sovereign immunity and not waived it, except in ten carefully defined and limited circumstances: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highway and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; (9) toxoids and vaccines; and (10) sexual abuse.  42 Pa. C.S. § 8522(b).  None of these exceptions apply to this case.  As set forth above, Defendant Holly was in an administrative capacity at SCI-Frackville, and not a medical treatment capacity.

Therefore, the court agrees with Defendant Holly and will grant summary judgment in her favor on the intentional infliction of emotional distress claim.

### C. Defendant Monsalud's Motion for Summary Judgment Will Be Granted.

There are two remaining claims against Defendant Monsalud: (1) an Eighth Amendment deliberate indifference claim; and (2) an intentional infliction of emotional distress claim.  (Doc. 80.)  She seeks summary judgment on both claims.  (Doc. 190.)

#### 1.  Statement of Facts

Defendant Monsalud submitted much the same evidence as Defendant Holly.  Significantly, between June 1, 2019 and June 7, 2019, nurses documented that Plaintiff was able to self-administer all drops without difficulty.  (Doc. 191, ¶ 56; Doc. 190-5, p. 17.)

On June 3, 2019, Plaintiff had an outside ophthalmology follow-up with Dr. Papchristou, who recommended surgery on the right eye due to increased pressure.  (Doc. 191, ¶ 57; Doc. 190-6, pp. 301–07.)

On June 6, 2019, Defendant Monsalud submitted a consult request for Plaintiff to be seen in a follow-up by an ophthalmologist noting increasing intraocular pressures.  (Doc. 191, ¶ 58; Doc. 190-2, pp. 356–57.)

On June 7, 2019, Defendant Monsalud entered a progress note stating that Plaintiff needed to sign a Release from Responsibility following his refusal to undergo surgery for his severe glaucoma and she also intended to discuss his medication non-compliance and changing his eye drops to keep on person.  (Doc.

191, ¶ 59; Doc. 190-2, pp. 87–88.)  However, Plaintiff refused to see Defendant Monsalud, and instead Defendant Holly spoke with him in the hallway about keeping his eye drops on his person due to the fact that proper absorption requires a five-minute interval between each drop.  (*Id*.)  Plaintiff refused to take his eye drops.  (*Id*.)  Since Plaintiff was unwilling to keep the eye drops on his person, the order for his medications continued as "Direct Observation Therapy" and he continued to receive his eye drops in the following two weeks.  (Doc. 191, ¶ 60; 190-5, pp. 11–15.)[3]

Defendant Monsalud then submitted an urgent referral to psychiatry based on Plaintiff's refusal of surgery three times, refusing to keep his medications on his person, and threatening to swallow the eye drops if forced to keep them on his person.  (Doc. 191, ¶ 61; Doc. 190-2, p. 86.)  Defendant Monsalud also completed a Release from Responsibility form documenting that Plaintiff refused surgery for the third time in a row, refused to take his eye drops to his cell for self-administration for maximum absorption, and explained that without treatment he may go blind in his right eye.  (Doc. 191, ¶ 62; Doc. 190-2, pp. 84–85.)  Plaintiff refused to sign the document.  (*Id*.)  Later that same day, Plaintiff was seen by Deborah Andrews for a psychiatric consultation.  (Doc. 191, ¶ 63; 190-2, pp. 89–

---

[3] These are the same medication reports submitted by Defendant Holly and summarized above.

90.)[4]  Plaintiff was encouraged to takes his medications as prescribed, but was not receptive.  (*Id*.)  Plaintiff denied all suicidal ideation at the time, but it was decided that medications would continue as they had in the past as direct observation therapy.  (*Id*.)

On June 13, 2019, a nurse noted that plaintiff "has been counseled numerous times on med non compliance by nursing and the doctor.  [I]nmate state he knows what is best for him."  (Doc. 191, ¶ 64; Doc. 190-2, p. 81.)

On June 17, 2019, Plaintiff saw Kathryn Hansell for a mental health visit on referral by Defendant Monsalud.  (Doc. 191, ¶ 65; Doc. 190-2, pp. 68–70; 75–76.) Plaintiff stated he was compliant with his eyedrops but refused to keep them on his person.  (*Id*.)

On June 25, 2019, Defendants Newton, Monsalud, and Holly collectively made the decision to change his medication administration to keep on person. (Doc. 191, ¶ 67; 190-8, p. 7.)  After being informed of this change, Plaintiff spoke with Kathryn Hansell, and expressed his frustration with medical and stated he would decline to take his medications as keep on person.  (Doc. 191, ¶ 68; Doc. 190-2, pp. 63–65.)  Plaintiff stated that he was not suicidal.  (*Id*.)

---

[4] The statement of facts states that Defendant Newton was the provider who saw Plaintiff on June 7, 2019.  (Doc. 191. ¶ 62.)  However, the evidence submitted demonstrates it was Deborah Andrews who signed the treatment note.  (Doc. 190-2, pp. 89–90.)

On June 27, 2019, Plaintiff was seen by Nurse Practitioner Iannuzzi, and threatened to swallow his medications if kept on his person, yet denied any thoughts of self harm.  (Doc. 191, ¶ 70; Doc. 190-2, pp. 60–62.)  Plaintiff was referred to psychiatry.  (*Id*.)  Plaintiff reported to a nurse that he had not taken his medications in days due to issues with the medical department regarding his eye drops and denied any issues after his eye drops were applied.  (Doc. 191, ¶ 71; 190-2, pp. 45–47.)

On June 28, 2019, Plaintiff reported to sick call with complaints of right eye pain.  (Doc. 191, ¶ 72; Doc. 190-2, pp. 57, 395, 397.)  Plaintiff was offered his eye drops and cautioned that without them he could lose his vision, but he again refused an examination and refused to sign a refusal of treatment form.  (*Id*.)  Plaintiff was again referred to psychiatry.  (*Id*.)  Plaintiff was seen for the psychiatric referral that same day by Katheryn Hansell.  (Doc. 191, ¶ 73; Doc. 190-2, pp. 54–56.)  Plaintiff was counseled on how refusing his eye drops was detrimental to his eye health, he denied suicidal ideation or self-harm, and he presented "outdated paperwork that he was unable to keep these on person."  (*Id*.)

On July 1, 2019, Plaintiff was seen by Defendant Newton and was deemed psychiatrically stable and denied any suicidal ideation.  (Doc. 191, ¶ 74; Doc. 190-2, p. 43.)

On July 8, 2019, a nurse completed a Release from Responsibility form after Plaintiff refused his eyedrops.  (Doc. 191, ¶ 75; Doc. 190-2, pp. 40–41.)  Plaintiff refused to sign it.  (Doc. 190-2, p. 41.)

On July 10, 2019, Defendant Holly, the Superintendent Assistant, and a counselor met with Plaintiff to discuss his refusal to keep his eye drops on his person, and Plaintiff claimed that the medical department was refusing him his eye drops.  (Doc. 191, ¶ 76; Doc. 190-4, p. 240.)

On July 11, 2019, Defendant Newton entered a chart note indicating that he had spoken with Defendant Holly, and stated "There is no reason for this as he can take the eye drops to his cell which he is refusing to do."  (Doc. 191, ¶ 77; Doc. 190-3, pp. 163–64.)  Defendant Newton relayed this to Plaintiff on July 15, 2019, and stated in his notes that "[t]here is no psychiatric reason why he cannot keep his eye drops inside his cell as KOP to have it applied by himself."  (*Id*.)

On July 17, 2019, Plaintiff was again counseled on dangers of medication non-compliance, and he stated he would "think about it," and refused to sign the medical refusal form.  (Doc. 191, ¶ 82; 190-4, pp. 229–30.)  Later that day, Plaintiff's refusal was discussed at the Medical Director's meeting, and Defendant Monsalud wrote that Plaintiff had never been compliant with applying his eye drops, he refused surgery, refused to sign medical refusal forms, and refused to keep hie eye drops in his cell.  (Doc. 191, ¶ 83; 190-4, pp. 222–23.)

On July, 30, 2019, Plaintiff was brought into the treatment area to have his eye drops administered, but the treatment room was occupied.  (Doc. 191, ¶ 84; Doc. 190-4, p. 216.)  Despite assurances that once the room was vacant it could be used, Plaintiff became agitated, refused treatment, and left the medical department. (*Id.*)

On August 9, 2019, Plaintiff was seen by ophthalmologist Dr. Pantanelli, and told him that he had not had his eye drops in weeks.  (Doc. 191, ¶ 85; Doc. 190-6, pp. 243–47.)  Plaintiff's vision in the right eye was blurry.  (*Id.*)  He was told to take his medications as prescribed.  (*Id.*)

In August, Plaintiff was treated by Dr. Papachristou and reported he had only just restarted his eyedrops.  (Doc. 191, ¶ 87; Doc. 190-6, pp. 364–70.) Plaintiff's right eye was only capable of light perception.  (*Id.*)

Defendant Monsalud also provided a historical record of allegations of sexual harassment towards female staff.  (Doc. 191, ¶¶ 16, 20, 52, 61, 62, 63, 119– 20.)

Plaintiff responded by attacking the evidence concerning the allegations of sexual harassment towards female staff and alleging that the medical staff are lying in their reports.  (Doc. 205.)  Plaintiff submitted documents already included in Defendant Monsalud's submissions.  (Doc. 205-1.)

Despite Plaintiff's accusations of dishonesty, the court finds that there is no real issue of material fact surrounding the evidence Defendant Monsalud submitted in support of the motion for summary judgment.

### 2. Eighth Amendment Claim

Defendant Monsalud moves for summary judgment on the Eighth Amendment claim. As set forth in more detail above, a prison official or healthcare provider violates the Eighth Amendment by "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. Additionally, the court will not apply the "vulnerability to suicide" farmwork set forth in *Palakovic* because no attempt of suicide occurred.

Plaintiff alleges that Defendant Monsalud denied him his eye drops in June and July of 2019. But Defendant Monsalud has presented evidence that Plaintiff continued to receive his eye drops in June and July of 2019, and the only missed doses were those that Plaintiff either refused or failed to show up to receive. (Doc. 190-5, pp. 11–15.) Furthermore, when Plaintiff refused his eye drops, he was referred to psychology for consultation, and all these consultations showed no suicidal ideation or thoughts of self-harm. The fact that Plaintiff disagreed with Defendant Monsalud's decision to change the administration of the eye drops to keep on person for self-administration does not rise to the level of an Eighth Amendment violation. *See White*, 897 F.2d at 110. Therefore, Defendant

Monsalud's motion will be granted, and judgment will be entered in his favor as to the Eighth Amendment Claim.

### 3. Intentional Infliction of Emotional Distress Claim

Defendant Monsalud also moves for summary judgment on the intentional infliction of emotion distress claim.  As discussed above, to succeed in an intentional infliction of emotions distress claim under Pennsylvania law requires a plaintiff to establish four elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." *Bruffet*, 692 F.2d at 914.

Considering Defendant Monsalud has presented evidence that Plaintiff received his eye drops except the doses that Plaintiff refused or failed to show up to receive, Plaintiff cannot present evidence that Defendant Monsalud's conduct was "extreme and outrageous."  It was Plaintiff's conduct that resulted in not receiving eye drops, not that of Defendant Monsalud.  Therefore, Defendant Monsalud's motion will be granted as to the intentional infliction of emotional distress claim.

### D. Plaintiff's Remaining Motions Will Be Denied.

On May 32, 2023, Plaintiff provided notice to the court that he had been moved to SCI-Coal Township.  (Doc. 172.)  In November of 2023, Plaintiff filed a motion for a temporary restraining order and preliminary injunction seeking to

have SCI-Coal Township administer his eyedrops under direct observation.  (Doc. 199.)

"When evaluating a motion for preliminary injunctive relief, a court considers four factors: (1) has the moving party established a reasonable likelihood of success on the merits (which need not be more likely than not); (2) is the movant more likely than not to suffer irreparable harm in the absence of preliminary relief; (3) does the balance of equities tip in its favor; and (4) is an injunction in the public interest?" *Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. 2019) *reversed on other grounds by* 141 S. Ct. 1868 (U.S. 2021). "The first two factors are prerequisites for a movant to prevail." *Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018).

As addressed above, Plaintiff cannot succeed on the merits of his claims. Therefore, the motion will be denied.  Likewise, Plaintiff's motion for appointment of counsel will be denied.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment will be granted.  Plaintiff's "Motion For Inopposition to Defendant Karen Holly Undisputed Facts" is construed as a brief in opposition, and the motion will be denied as moot.  Plaintiff's motion for a preliminary injunction and temporary restraining order will be denied.  Plaintiff's motion for appointment of counsel will

be denied.  Judgment will be entered in Defendants' favor, and the Clerk of Court will close the case.

An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: February 27, 2023